**\*NOT FOR PUBLICATION\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WHITE WINSTON SELECT ASSET FUNDS, LLC,

          Plaintiff,

          v.

INTERCLOUD SYSTEMS, INC.,

          Defendant.

Civil Action No. 13-7825(FLW)

**OPINION**

**WOLFSON**, **United States District Judge:**

      This matter comes before the Court upon a Complaint filed by Plaintiff White Winston Select Asset Funds, LLC ("WWSAF" or "Plaintiff") seeking damages against Defendant InterCloud Systems, Inc. ("InterCloud" or "Defendant") for allegedly breaching contractual obligations between the two parties related to a financing arrangement. In particular, Plaintiff asserts claims of: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing; and (3) promissory estoppel. Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure (12)(b)(6) for failure to state a claim upon which relief can be granted. In that regard, Defendant argues that Plaintiff's claims fail because there is no binding, enforceable agreement between the parties. For the following reasons, Defendant's Motion to Dismiss is granted.

**BACKGROUND**[1]

In or about May 2013, WWSAF and InterCloud entered into negotiations regarding a proposed secured financing (the "Financing"), whereby WWSAF would invest up to five million dollars in InterCloud to be advanced towards redemption of outstanding shares of InterCloud's preferred stock and general working capital. *See* Complaint at ¶¶ 7-8. On July 24, 2013, InterCloud agreed to and accepted a "Term Sheet" prepared by WWSAF outlining the principal terms of the proposed secured financing. *Id*. at 1. Under the Term Sheet, InterCloud was to issue WWSAF a senior secured convertible debenture (the "Debenture") with a term of one year in the amount of five million dollars. *Id.* at ¶ 9.

In that connection, the particular provisions of the Term Sheet relevant to the present action are as follows. First, following the proposed offer and sale of InterCloud's common stock pursuant to a Registration Statement on Form S-1 (the "Offering"), WWSAF would have the right to convert the Debenture into shares of InterCloud's common stock at a premium price; in the event that the Offering did not close, WWSAF would still have the right to convert the Debenture into shares of InterCloud's common stock at fixed price. *Id.* at ¶ 13. Second, as a condition precedent to the Financing, WWSAF was required to enter into an inter-creditor agreement with MidMarket Capital Partners, LLC ("MidMarket"). *Id.* at ¶ 20.[2] Third, the Term Sheet included a "Termination

---

[1] In reviewing this motion to dismiss, factual allegations are taken from Plaintiff's Complaint, and those exhibits attached to the Complaint, including the Term Sheet discussed herein, and are assumed to be true. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (noting that on motion to dismiss, court may consider undisputedly authentic documents that relate to the claims in the complaint).

[2] At the time the Term Sheet was drafted, WWSAF had already entered into discussions with MidMarket and had obtained MidMarket's agreement in principal to the terms of the intercreditor agreement prior to InterCloud's acceptance of the Term Sheet. *Id*. at ¶ 21. InterCloud was aware of the negotiations between WWSAF and MidMarket, and InterCloud had also obtained MidMarket's agreement in principal to the terms of the intercreditor agreement prior to executing the Term Sheet. *Id*. at ¶¶ 22-23.

2

Date" that stipulated that the contemplated agreement between the parties "shall terminate upon the earlier of the following: (a) a date which is thirty days (30) after [InterCloud] shall have provided [WWSAF] by written notice that it does not wish to proceed with the Financing; or (b) November 15, 2013." Term Sheet, ¶ 22; Complaint, ¶ 24. The Term Sheet further provided that all obligations of the parties would be deemed null and void as of the Termination Date, with the exception of Sections 17(d), 18, and 19. Term Sheet, ¶ 22; Complaint, ¶ 24. Fourth, and in relation to the Termination Date, the Term Sheet contained a break-up fee provision in Paragraph 17(d), which required InterCloud to pay WWSAF "if, within 45 days of the Termination Date, WWSAF was prepared to close the Financing under substantially the same terms and conditions as set forth [in the Term Sheet], but InterCloud failed to close with WWSAF because InterCloud arranged financing through another source." Complaint, ¶ 25. In that event, InterCloud was required to pay WWSAF a break-up fee as follows:

> (i) if [InterCloud] closes the Offering within such 45 day period, then InterCloud shall pay WWSAF the sum of … $100,000.00; or (ii) if [InterCloud] closes with any other lender, investor, or other party (separate from a closing under the S-1 Registration) within such 45 days, then [InterCloud] shall pay [WWSAF] . . . $500,000.00. In the event both (i) and (ii) of the preceding sentence applies, [InterCloud] shall pay a Break-Up Fee of $500,000. The Break-Up Fee shall be immediately due and payable by InterCloud to WWSAF.

Term Sheet at ¶ 17(d). Additionally, Paragraphs 18 (the "Reimbursement Provision") and 19 of the Term Sheet, which also survived the Termination Date, obligated InterCloud to fully reimburse WWSAF for "any and all legal or other expenses" incurred by WWSAF in connection with the proposed Financing, as well as expenses incurred in the collection of amounts due to WWSAF pursuant to the Term Sheet if the proposed Financing did not close. Complaint, ¶¶ 31-32.

Following the execution of the Term Sheet, at all relevant times, including through the Termination Date, WWSAF was willing and prepared to close the Financing under substantially

3

the same terms and conditions as set forth in the Term Sheet. *Id.* at ¶¶ 33, 35. Indeed, throughout the summer and fall of 2013, WWSAF diligently prepared to close the Financing by working in good faith with InterCloud, and neither InterCloud nor WWSAF ever served written notice that either party did not wish to proceed with the Financing. *Id.* at ¶ 34, 36.

On or about November 5, 2013, InterCloud closed the Offering, triggering WWSAF's rights under the Term Sheet. *Id.* at ¶¶ 13, 37. However, in September, 2013, and without WWSAF's knowledge, InterCloud entered into an agreement with PNC Bank, N.A. ("PNC"), which provided InterCloud with a revolving credit facility in a principal amount of up to $10,000,000.00 (the "PNC Facility"). *Id*. at ¶ 38. The PNC Facility, which is secured by substantially all of InterCloud's assets and the assets of InterCloud's subsidiaries, made it unnecessary for InterCloud to close the Financing with WWSAF. *Id*. at ¶¶ 39-40. In a parallel agreement, InterCloud entered into an amendment to its loan agreement with MidMarket without informing WWSAF, through which InterCloud obtained MidMarket's consent to grant PNC a senior security interest in InterCloud's assets. *Id*. at ¶ 41. InterCloud's amendment of its loan agreement with MidMarket precluded WWSAF from entering into the intercreditor agreement with Midmarket on the terms in the Term Sheet. *Id*. at ¶ 42. Subsequently, on or about December 13, 2013, InterCloud completed the sale of convertible debentures within forty-five days of the Termination Date, without any involvement by WWSAF. *Id*. at ¶¶ 45-46. In other words, InterCloud's agreement with PNC and the sale of debentures negated the contemplated Financing with WWSAF. *Id*. at ¶ 47.

Because WWSAF was prepared to go through with the Financing, WWSAF demanded, via letter dated November 15, 2013, from InterCloud a break-up fee in the amount of $100,000, pursuant to the Term Sheet as a result of the closing of the Offering on November 5, 2013, and an

additional break-up fee in the amount of $500,000 as a result of InterCloud's consummation of the PNC Facility, the grant to PNC of a senior security interest in InterCloud's assets, and the sale of its debentures. *Id.* at ¶¶ 48-50. In response, InterCloud, by letter dated November 24, 2013, refused to pay any break-up fee. *Id.* at ¶ 51. Thereafter, WWSAF filed this action in December, 2013, asserting claims for breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel. InterCloud subsequently filed the instant motion to dismiss for failure to state a claim upon which relief can be granted.

## II.   STANDARD OF REVIEW

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the 12(b)(6) standard. The factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 555. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating . . . [a] claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 127 U.S. at 556); *see also Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to 'set out in detail the facts upon which he bases his claim.' . . . The pleading standard

5

'is not akin to a 'probability requirement,'" . . . to survive a motion to dismiss, a complaint merely has to state a 'plausible claim for relief.'" (Citations omitted.)).

In affirming that *Twombly*'s standards apply to all motions to dismiss, the Supreme Court explained several principles. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. U PMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). However, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings . . . [although a] limited exception exists for documents that are integral to or explicitly relied upon in the complaint." *W. Penn Allegheny Health Sys., Inc. v. U PMC*, 627 F.3d 85, 97 n.6 (3d Cir. 2010) *cert. denied*, 132 S.Ct. 98 (2011) (citation and internal quotation marks omitted).

**III.    DISCUSSION**

WWSAF's Complaint raises several claims arising from InterCloud's actions following the execution of the Term Sheet. In Count I, WWSAF brings a breach of contract claim against InterCloud, asserting that the Term Sheet constitutes a binding enforceable agreement that InterCloud breached. *Id.* at ¶ 52-68. Within that claim, WWSAF first asserts that the break-up fee, as set forth in Paragraph 17(d) of the Term Sheet, survived the Termination Date as a valid and enforceable obligation. *Id.* at ¶¶ 54-55. WWSAF claims that because of InterCloud's agreement with PNC and the sale of the its debentures, InterCloud failed to close the Financing

with WWSAF.  *Id* at ¶¶ 56-58.  As a result, WWSAF claims that InterCloud was and is required to pay WWSAF the $500,000 break-up fee, which InterCloud has failed and refused to do, despite WWSAF's demands.  *Id.* at 60-61.  Second, WWSAF claims that InterCloud failed to reimburse WWSAF for expenses, pursuant to Paragraph 18 of the Term Sheet.  *Id*. at ¶ 62-63.  Specifically, WWSAF contends that it incurred approximately $33,000 in expenses, and that InterCloud has breached its obligation to reimburse WWSAF for those expenses.  *Id*. at ¶¶ 65-68.

Under Count II, WWSAF avers that InterCloud is also liable for breaching the implied duty of good faith and fair dealing.  *Id*. at ¶¶ 69-73.  In particular, WWSAF claims that "InterCloud owed WWSAF an implied duty of good faith and fair dealing separate from InterCloud's obligations under the express terms of the Term Sheet," and that the parties failed to close the Financing as a result of InterCloud's failure to deal with WWSAF in good faith.  *Id* at ¶¶ 70-73.

Lastly, in Count III, WWSAF brings a promissory estoppel claim, alleging that InterCloud promised to reimburse WWSAF's expenses and costs pursuant to Paragraph 18 of the Term Sheet, and that WWSAF reasonably relied upon this promise.  *Id*. at ¶¶ 75-78.  WWSAF argues that InterCloud understood that this promise, and others made in the Term Sheet, "would induce WWSAF to devote time and resources, and take steps and incur significant costs to proceed with the Financing with the expectation that the Financing would close and that WWSAF would be reimbursed its expenses."  *Id*. at ¶ 76.  Accordingly, WWSAF claims that it has suffered losses as a result of InterCloud's failure and refusal to close the Financing with WWSAF and that InterCloud must reimburse WWSAF for the expenses incurred in connection with preparing for the Financing.  *Id*. at ¶¶ 78-80.

InterCloud moves to dismiss all of WWSAF's claims pursuant to Federal Rule of Civil Procedure (12)(b)(6) for failure to state a claim upon which relief could be granted as follows: (1)

WWSAF's breach of contract claim must be dismissed because the Term Sheet is a non-binding and unenforceable agreement; (2) WWSAF's claim for breach of the implied duty of good faith and fair dealing must be dismissed as duplicative of the breach of contract claim; and (3) WWSAF's claim for promissory estoppel must be dismissed as duplicative of the breach of contract claim.  I address each of these arguments in turn.

**A.     Breach of Contract Claim**

"To state a claim in federal court for breach of contract under New York law,[3] a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  "[T]he words employed in the agreement must be given their plain meaning, and the agreement must be construed to accord a meaning and purpose to each of its parts."  *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 226 (S.D.N.Y. 2012) (quoting *Siebel v. McGrady*, 566 N.Y.S.2d 736, 738 (3d Dep't 1991)) (internal quotation marks omitted).  Because the parties agree that they did not execute any final agreement for the Financing, the issue is whether the Term Sheet constitutes a binding preliminary agreement.

"Parties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements."  *Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998).  "When they do so and the parties fail to execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree."  *Id*.  Here, the parties dispute the enforceability of the break-up fee and the reimbursement provision in the Term Sheet.  Plaintiff asserts that the

---

[3]     The parties agreed that the Term Sheet would be governed by New York law.  *See* Term Sheet, ¶ 10.

8

Term Sheet was an enforceable preliminary agreement, while Defendant argues that the Term Sheet was an unenforceable agreement to agree.

Under New York law, "[o]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Adjustrite Sys., Inc.* at 548. However, "in some circumstances . . . preliminary agreements can create binding obligations." *Id.* "The extent of the obligations created depends on the preliminary agreement in question, though, in general, 'binding preliminary agreements fall into one of two categories.'" *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (quoting *Adjustrite Sys., Inc.*, 145 F.3d at 548). The first type of preliminary agreement ("Type I") "occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987). "Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Id*; *Adjustrite Sys., Inc.*, 145 F.3d at 548. Therefore, a Type I preliminary agreement "binds both sides to their ultimate contractual objective in recognition that, 'despite the anticipation of further formalities,' a contract has been reached." *Adjustrite Sys., Inc.*, 145 F.3d at 548 (quoting *Tribune Co.*, 670 F. Supp. at 498); *see Brown*, 420 F.3d at 154 ("The hallmark of a Type I agreement is that the parties have agreed to all necessary elements of the contract and are, therefore, bound to the ultimate objective despite the fact that a more formal or elaborate writing has yet to be produced."). Consequently, "a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the 'preliminary' agreement." *Tribune Co.*, 670 F. Supp. at 498; *Adjustrite Sys., Inc.*, 145 F.3d at 548.

The second type of preliminary agreement—sometimes called a preliminary commitment—recognized by New York courts ("Type II") is "binding only to a certain degree," in that it "expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Adjustrite Sys., Inc.*, 145 F.3d at 548; *Tribune Co.*, 670 F. Supp. at 498. Unlike Type I preliminary agreements, Type II preliminary commitments only obligate the parties "to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *Tribune Co.*, 670 F. Supp. at 498. Thus, where a Type II preliminary commitment exists, a party may lawfully demand that "his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms." *Id*. In sum, Type II preliminary agreements do not commit the parties to "their ultimate contractual objective," and merely require the parties to negotiate in good faith. *Adjustrite Sys., Inc.*, 145 F.3d at 548; *Tribune Co*., 670 F. Supp. at 498 (explaining that the obligation to negotiate in good faith "bar[s] a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.").

Here, the parties agree that the Term Sheet was not a Type I preliminary agreement, *see* Pl. Opp., 17; however, Plaintiff argues that the Term Sheet was a Type II preliminary commitment that obligated the parties to negotiate in good faith. In that regard, Plaintiff contends that Defendant failed to negotiate in good faith, and, as a result, that Defendant is required pay the break-up fee and reimburse Plaintiff for expenses incurred in preparation for the Financing. *See id.* at 17-18. Plaintiff argues that while the ultimate goal of Financing was a non-binding provision, the break-up fee provision in paragraph 17(d) of the Term Sheet was a binding obligation in the preliminary agreement. In that regard, Plaintiff relies on the court's opinion in *FCS Advisors, Inc.,*

*v. Fair Finance Co.*, Civ. No. 07-6456, 2009 WL 1403869 (S.D.N.Y. May 19, 2009), for the proposition that contracts may include both binding and non-binding parts.

In general, New York courts look to five factors when considering whether a Type II preliminary agreement exists:

> (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*Brown v. Cara*, 420 F.3d at 157; *Tribune Co.*, 670 F. Supp. 499-503; *Arcadian Phosphates, Inc. v. Arcadian Corp*, 884 F.2d 69, 72 (2d Cir. 1989). Furthermore, in determining whether a Type II agreement exists, the intention of the parties as revealed by the language of the agreement is of primary importance. *Adjustrite Sys., Inc.*, 145 F.3d at 548-49; *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 229 (S.D.N.Y. 2012) ("The first factor, the intent to be bound as evidenced by the language of a preliminary agreement, is the most important."). "Thus, 'if the language of the agreement is clear that the parties did not intend to be bound, the Court need look no further.'" *Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 424 (S.D.N.Y. 2012) (quoting *Cohen v. Lehman Bros. Bank*, 273 F. Supp. 2d 524, 528 (S.D.N.Y. 2003)); *see Beekman Inv. Partners, L.P.*, Civ. No. 05-8746, 2006 WL 330323, at *7 (S.D.N.Y. Feb. 14, 2006) (holding Type II preliminary agreement did not exist where memorandum of intent included clear expression of intent not to be bound); *Network Enterprises, Inc. v. APBA Offshore Prod.*, 427 F. Supp. 2d 463, 483 (S.D.N.Y. 2006) ("The obligation to negotiate in good faith that a Type II preliminary agreement would otherwise impose upon a party may, of course, be negated by a sufficiently clear expression that the parties are not bound to each other in any way until a formal written contract is executed by both.").

In this case, a plain reading of the disclaimer language in the Term Sheet evidences a clear intent not to be bound. In fact, the parties explicitly stated their intention not to be bound by the Term Sheet in the disclaimer provision:

> This Term Sheet is intended for use only as the basis for continued discussion between the company and the investor, and does not constitute a commitment letter, an agreement to enter into a commitment letter, or an offer to enter into a commitment letter and shall not be deemed to obligate the investor, its affiliates, partners, or principals to close the financing under any terms or circumstances.

Term Sheet, at 10. Additionally, the Term Sheet specifically contemplates "continued discussions between the company and investor," and the parties recognized that the Term Sheet served as a mere summary of "the principal terms of a *proposed* secured financing." Term Sheet, at 1, 10 (emphasis added). Finally, the Term Sheet in this case is clearly distinguishable from the letter of intent in *FCS Advisors*. In *FCS Advisors*, the letter of intent "expressly provide[d] that it [was] not a legally binding contract *except* for sections 6 through 12. *FCS Advisors, Inc.*, 2009 WL 1403869 at *2 (emphasis added). Conversely, here, neither the reimbursement provision nor the break-up fee contain explicit language stating that those provisions were binding or otherwise enforceable. Accordingly, this Court finds that the Term Sheet as a whole was not a Type II preliminary commitment, and thus Plaintiff cannot obligate Defendant to *any* of the provisions in the Term Sheet, including the break-up fee provision. *Cf. id.*

Even assuming *arguendo* that the Term Sheet could be interpreted as a Type II preliminary agreement, this would still not permit Plaintiff to impose the break-up fee obligation on Defendant. As explained above, the sole obligation that arises under a Type II preliminary agreement is the obligation between the parties Defendant to negotiate in good faith. *Adjustrite Sys., Inc.*, 145 F.3d at 548 (explaining that Type II preliminary agreements do not commit the parties any " ultimate contractual objective," and merely require the parties to negotiate in good faith). Thus, even

assuming that Defendant was obligated, but failed, to negotiate in good faith, Plaintiff's argument that the penalty for Defendant's breach of that obligation is found in the non-binding Term Sheet is not supported by law or reason. *See id.* Put differently, Plaintiff cannot argue, as it does, on the one hand that the Term Sheet as a whole was non-binding—and, significantly, nowhere contained any language regarding specific provisions being binding—but that Defendant's failure to negotiate in good faith triggered the break-up fee/reimbursement provisions. Plaintiff's argument, taken to its logical end, would eviscerate the difference between preliminary binding and non-binding agreements established under New York law, as it would allow a party to get the benefit of selectively enforcing an otherwise non-binding provision to the detriment of the other party. In sum, under the Term Sheet, Plaintiff "only had to the right to demand that [Defendant] negotiate the terms of the [Financing] in good faith," and did not obligate Defendant to any specific term or provision, including the break-up fee and reimbursement provision. *See Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 628 (S.D.N.Y. 2009). Accordingly, because there is no enforceable agreement in this case, Plaintiff's breach of contract claim is dismissed.

**B.     Duty of Good Faith and Fair Dealing**

In Count II, Plaintiff brings a claim for breach of the implied duty of good faith and fair dealing, arguing that Defendant owed Plaintiff duties separate and independent from those under the breach of contract claim, and that Plaintiff violated those duties. First, Plaintiff claims that the break-up fee expressly provided that Defendant would be liable to Plaintiff for entering into another financing arrangement within 45 days of the Termination Date, and that Defendant did enter into such agreements while Plaintiff was performing its due diligence. Second, Plaintiff cites several acts of Defendant that were allegedly made in bad faith, including Defendant's failure to disclose to Plaintiff the intended sale of its debentures, Defendant's failure to disclose its

negotiations with MidMarket, and other acts of Defendant allegedly undertaken in secrecy and intentionally withheld from Plaintiff.

In response, Defendant argues that Plaintiff's cause of action for breach of the implied duty of good faith and fair dealing must be dismissed because the Term Sheet was not a binding contract, and Defendant's alleged conduct is not separate from Plaintiff's breach of contract claim. Defendant asserts that New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Def. Br., 16. In sum, Defendant argues that Plaintiff's claim for breach of the implied duty of good faith and fair dealing is duplicative of the breach of contract claim, and, as a result, must be dismissed.

"There is implicit in all contracts . . . an implied covenant of fair dealing and good faith." *Van Walkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.3d 34, 45 (1972). *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). "Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). Thus, a claimant's breach of the implied covenant of good faith and fair dealing claim must arise out of an agreement between the parties. *See Bank of N.Y. v. Sasson*, 786 F.Supp. 349, 354 (S.D.N.Y. 1992) ("[T]he implied covenant of good faith and fair dealing is limited to performance under a contract and does not encompass future dealings or negotiations between the parties."); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) ("The implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract." (Citations omitted.)). Accordingly, the implied covenant "does not 'add . . . to the contract a

14

substantive provision not included by the parties.'" *Broder*, 418 F.3d at 199 (quoting *Green v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993).

I have already found that the Term Sheet is not a binding preliminary agreement, and thus Plaintiff's implied covenant claim fails for lack of a valid and binding contract from which such a duty would arise. *FCOF UB Securities v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 231-32 (S.D.N.Y. 2009) (applying New York law); *see also Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, Civ. No. 05 Civ. 8746, 2006 WL 330323, at *7 (S.D.N.Y. Feb. 14, 2006). "A cause of action for breach of an implied duty of good faith and fair dealing . . . [is] properly dismissed for lack of a valid and binding contract from which such a duty would arise." *American-European Art Assocs., Inc. v. Trend Galleries, Inc.*, 227 A.D.2d 170, 641 N.Y.S.2d 835, 836 (1st Dep't 1996). Accordingly, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing claim is dismissed.[4]

---

[4] Moreover, Plaintiff's implied covenant claim must be dismissed even if, *arguendo*, the Term Sheet constitutes a binding agreement. New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). It is clear from the Complaint that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is based on the same predicate facts underlying Plaintiff's breach of contract claim. Although Plaintiff contends that Defendant owed Plaintiff an implied duty separate and independent of Defendant's obligations under the Term Sheet, this aspect of Plaintiff's claim is pled in a conclusory fashion, with no additional facts to substantiate it. Accordingly, even assuming that the Term Sheet constitutes a binding preliminary agreement—which, for the reasons above, I find that it does not—I would nevertheless dismiss Plaintiff's claim for breach of the implied duty of good faith as being duplicative of its contract claim. *See In re Houbigant, Inc. v. ACB Mercantile, Inc.*, 914 F. Supp. 964, 989 (S.D.N.Y. 1995) (explaining that claim for breach of the implied covenant "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim for breach of covenant of an express provision of the underlying contract").

### C. Promissory Estoppel

In Count III, Plaintiff brings a claim for promissory estoppel. In that connection, Plaintiff argues that Defendant made a clear and definite promise to reimburse Plaintiff for the expenses incurred in preparation for the Financing. Furthermore, Plaintiff alleges that Defendant understood that this promise would "induce WWSAF to devote time and resources, and take steps and incur significant costs to proceed with the Financing with the expectation that the Financing would close and WWSAF would be reimbursed for its expenses." *Complaint* at ¶ 76. Plaintiff claims that Defendant neither closed the Financing nor reimbursed Plaintiff, and, as a result, Plaintiff has suffered damages. In response, Defendant argues that while Plaintiff may be able to plead a claim for promissory estoppel in the alternative, here, Plaintiff's claim must be denied because the underlying basis for the claim is dependent on the Term Sheet. In that regard, Defendant argues that Plaintiff has failed to allege any duties independent of the Term Sheet, and, therefore, Plaintiff's promissory estoppel claim must be dismissed as redundant of the breach of contract claim.

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000); *see Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir.1996). "Because it is a quasi-contractual claim, however, promissory estoppel generally applies only in the absence of a valid and enforceable contract."[5] *Kwon v. Yun*, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009). In this case, having determined that the Term Sheet is not a valid and

---

[5] For this reason, Defendant's contention that Plaintiff's promissory estoppel claim must be dismissed as "duplicative" of the breach of contract claim is misplaced.

16

enforceable contract, the issue is whether Plaintiff has adequately pled the elements for promissory estoppel.

Review of the Complaint reveals that Plaintiff's promissory estoppel claim must be dismissed. Plaintiff's claim is based solely on the provisions set forth within the Term Sheet. As noted above, the disclaimer language at the end of the Term Sheet clearly evinces that all promises and provisions within the Term Sheet were contingent upon the signing of a future contract. Thus, Plaintiff could not reasonably rely on the Term Sheet as an "unambiguous promise" in support of a promissory estoppel claim. *See, e.g.*, *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir. 1984) (dismissing promissory estoppel claim for lack of a clear and unambiguous promise where "[t]he negotiations of the parties as reflected in the draft agreements made it clear that the obligations of both SCM and Muller were contingent upon execution . . . of the formal contract documents."); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 79 (2d Cir. 1984) (holding that because the parties negotiations made it clear that any promise or agreement was conditional upon the signing of a written contract, there was never a clear or unambiguous promise); *Frutico S.A. de C.V., Itex, Inc. v. Bankers Trust Co.*, 833 F. Supp. 288, 299 (S.D.N.Y. 1993). Plaintiff does not allege any duties on Defendant that are independent of the Term Sheet, and thus, as pled, Plaintiff fails to state a claim for promissory estoppel claim. Accordingly, Count III of the Complaint is dismissed.

**CONCLUSION**

For the foregoing reasons, the Court determines that Plaintiff fails to state a claim upon which relief can be granted in all Counts of the Complaint. The Court therefore grants Defendant's motion to dismiss.

Dated: August 19, 2014          /s/ Freda L. Wolfson
                                Hon. Freda L. Wolfson
                                United States District Judge