NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                                      :
WHITE WINSTON SELECT ASSET              :
FUNDS, LLC,                                          :
                                                      :          Civil Action No. 13-7825-BRM-DEA
                        Plaintiff,                :
                                                      :
            v.                                        :
                                                      :
INTERCLOUD SYSTEM, INC.,                   :
                                                      :                   **OPINION**
                        Defendant.             :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are: (1) Defendant Intercloud Systems, Inc.'s ("Defendant") Motion for

Summary Judgment (ECF Nos. 38-39); Plaintiff White Winston Select Asset Funds, LLC's

("Plaintiff") Motion for Summary Judgment (ECF No. 42); and (3) Plaintiff's Motion for Writ of

Attachment (ECF No. 45). All motions are opposed. (*See* ECF Nos. 49, 55, 56.) Pursuant to Federal

Rule of Civil Procedure 78(a), the Court heard oral argument on September 6, 2017. (ECF No.

63.) For the reasons set forth below, Plaintiff's Motion for Summary Judgment (ECF No. 42) is

**GRANTED** and Defendant's Motion for Summary Judgment (ECF Nos. 38-39) is **DENIED**.

Plaintiff's Motion for Writ of Attachment is **DENIED AS MOOT**.

I.      **BACKGROUND**

        **A.  Facts Relating to Summary Judgment Motion**

        Defendant is a publicly traded corporation that, via its subsidiaries, provides

telecommunications and cloud computing services. (Pl.'s Resp. to Statement of Facts (ECF No.

56-1) ¶ 1.) It is a corporation organized and existing under the laws of Delaware with its principal

place of business in New Jersey. (Def.'s Resp. to Statement of Facts (ECF No. 54) ¶ 2.) Plaintiff

is a firm engaged in debt and equity investing into private company and small-cap public companies. (ECF No. 56-1 ¶ 10.) It is a limited liability company organized and existing under the laws of Utah with its principal place of business also in Utah. (ECF No. 54 ¶ 1.)

On September 17, 2012, MidMarket Capital Partners, LLC ("MidMarket"), executed a loan and security agreement with Defendant providing approximately $13 million in financing (the "MidMarket Loan"). (ECF No. 56-1 ¶ 3.) The MidMarket Loan prohibited Defendant from incurring certain types of additional debt unless MidMarket approved them. (*Id.* ¶ 6.) Specifically, the MidMarket Loan states Defendant agrees not to "create, incur, assume, guaranty, or otherwise become or remain directly or indirectly liable on a fixed or contingent basis, with respect to any [i]ndebtedness" with the exception of certain categories identified in the MidMarket Loan. (ECF No. 41-3 at 45.)[1] With MidMarket's knowledge, Defendant continued to seek additional sources of funding from late 2012 to early 2014. (ECF No. 56-1 ¶ 7.)

In the spring of 2013, Plaintiff entered into negotiations with Defendant to provide Defendant with up to $5,000,000 in secured financing. (ECF No. 54 ¶ 3.) Defendant sought the proposed financing in order to redeem outstanding shares of its preferred stock, as well as for working capital. (*Id.* ¶ 5.) The principal terms and conditions of the proposed financing were reduced to a term sheet (the "Term Sheet") executed on July 24, 2013. (*Id.* ¶ 6.) The parties agreed the Term Sheet would be governed by the laws of the State of New York without regard to any conflict of law principles. (*Id.* ¶ 7.) Under the Term Sheet, the proposed financing was to take the form of a senior secured convertible debenture (the "Debenture"), to be issued by Defendant at the

---

[1] The parties agree Defendant granted MidMarket a "perfected [l]ien of first priority ranking (subject only to the Permitted Encumbrances) in and to all right, title and interest of [Defendant] in any and all assets and all property of [Defendant], all whether now owned or hereafter created, arising or acquired and wherever located" in the MidMarket Loan. (ECF No. 54 ¶ 12.)

time of closing with a term of one year and in the original principal face amount of up to $5,000,000. (*Id.* ¶ 8.) The Debenture was to be secured as follows:

a. A UCC-1 (junior only to the existing credit facility payable to MidMarket Capital) security interest in all tangible and intangible property now owned by the Company or to be acquired in the future including without limitation: accounts receivable together with all instruments, notes, claims, choses in action and other types of obligations arising therefrom, inventory, real property, machinery and equipment, other tangible and intangible property, patents, trademarks, and all future credit balances and reserves, goods, merchandise, other property in the possession of the Company or any of its subsidiaries' or affiliates' possession.

b. As a condition precedent to the Financing, the Investor shall have entered into a intercreditor agreement (the "Intercreditor Agreement") with MidMarket Capital on terms and conditions acceptable to the Investor and Mid-Mark in their respective discretion.

(Term Sheet (ECF No. 42-14) at 6.) The parties agree entering into an intercreditor agreement (the "Intercreditor Agreement") with MidMarkert was a condition precedent to closing the proposed financing pursuant to the Term Sheet. (ECF No. 54 ¶ 13.) In light of this obligation, before Defendant executed the Term Sheet, Plaintiff entered into discussions with MidMarket regarding the contemplated Intercreditor Agreement in June 2013. (*Id.* ¶ 14.) During their conversation, Plaintiff informed MidMarket it sought: (1) a secondary lien on Defendant's assets; (2) the right to cure any monetary default on behalf of Defendant; and (3) the unilateral right to purchase MidMarket's position at par in the event of Defendant's default. (ECF No. 56-1 ¶¶ 24-26.) Defendant alleges that during this discussion MidMarket objected to several terms proposed by Plaintiff, and the discussion terminated without resolution of those disputes. (ECF No. 54 ¶ 14.) Defendant contends it was not present for those discussions. (*Id.*)

The Term Sheet also included a break-up fee provision (the "Break-Up fee provision") to ensure Plaintiff would receive the benefit of its bargain if it was prepared to make the proposed financing available to Defendant, but Defendant closed on financing with another lender instead. (*See id.* ¶¶ 17-20.) It is undisputed Defendant was involved in discussions with several other

potential lenders or investors at the time the parties were negotiating the Term Sheet and that

Plaintiff was aware of those discussions. (*Id.* ¶ 19.) As executed, the Break-Up fee provision,

Section 17(d) of the Term Sheet, required:

> Break-up Fee. If, within forty-five (45) days from the Termination Date (as defined below), the Investor is prepared to close the Financing under substantially the same terms and conditions as set forth herein, but the Company fails to close with Investor due to the fact that the Company has arranged any financing through another source, then the Company shall pay the Investor a break-up fee (the "Break-up Fee") as follows: (i) if the Company closes the Offering within such 45 day period, then the Company shall pay the Investor the sum of One Hundred Thousand and No/100ths Dollars ($100,000.00); or (ii) if the Company closes with any other lender, investor, or other party (separate from a closing under the S-1 Registration) within such 45 days, then the Company shall pay the Investor Five Hundred Thousand and No/100ths Dollars ($500,000). In the event both (i) and (ii) of the preceding sentence applies, the Company shall pay a Break-up Fee of $500,000. The Break-Up Fee shall be immediately due and payable by the Company to Investor.

(ECF No. 42-14 at 9.)

On August 6, 2013, Plaintiff requested to examine a term sheet related to Defendant's

proposed financing with PNC Bank, N.A. ("PNC Bank"), another lender Defendant entered into

discussions with regarding a potential revolving credit agreement. (ECF No. 56-1 ¶¶ 8, 30.) After

receiving the PNC Bank term sheet, Plaintiff "did not comment on it or otherwise express . . .

[Defendant's] proposed financing with PNC [Bank] . . . endangered the [Plaintiff's] Financing

and/or breached the Term Sheet." (*Id.* ¶ 32.) Plaintiff alleges it was aware Defendant

> was involved in discussions with several other potential lenders or investors at the time the parties were negotiating the Term Sheet. This awareness underscored the need for a break-up fee provision in the Term Sheet. [Plaintiff] did not comment on, or otherwise express to [Defendant] that the proposed financing with PNC [Bank] would breach the Term Sheet and the break-up fee provision were self-evident.

(*Id.*)

Notably, Section 18 of the Term Sheet also provides Defendant "shall be required to pay

all of [Plaintiff's] reasonable costs, fees, and expenses (including, but not limited to all travel and

other expenses incurred by [Plaintiff] pursuant to the due diligence . . . paid or incurred in conjunction with the consideration of the Financing." (ECF No. 42-14 at 9.) In addition, it states Defendant agrees to pay all legal fees and expenses for services provided in connection with this transaction or the collection of amounts due to Plaintiff pursuant to the Term Sheet. (*Id.*)

On August 9, 2013, Plaintiff circulated a draft of the closing agenda concerning the parties' proposed financing to Defendant. (ECF No. 56-1 ¶ 33.) Plaintiff alleges it conducted due diligence for the proposed financing during the summer and fall of 2013, worked in good faith to close the proposed financing, and prepared necessary documentation—incurring costs and expenses in the interim. (ECF No. 54 ¶¶ 33, 34, 46). While Defendant does not dispute Plaintiff participated in the due diligence process, it disputes that Plaintiff completed its due diligence and completed drafting documents in anticipation of the closing. (*Id.* ¶ 33.)

On September 20, 2013, Defendant closed on the revolving credit and security agreement with PNC Bank (the "PNC Agreement"), which provided Defendant with a revolving credit facility of up to $10,000,000. (*Id.* ¶ 36.) Concurrent with Defendant signing the PNC Agreement, Defendant and MidMarket also amended the MidMarket Loan to allow PNC Bank to obtain a first priority security interest in Defendant's assets. (*Id.* ¶ 37.) PNC Bank's revolving credit facility was secured by substantially all of Defendant's assets and the assets of Defendant's subsidiaries. (*Id.* ¶ 38.) As a result, on October 11, 2013, Defendant informed Plaintiff, that, at best, it would "be taking a third position as to all collateral behind MidMarket and PNC [Bank]." (*Id.* ¶¶ 39-40.) Accordingly, Plaintiff argues the PNC Agreement rendered it impossible for the proposed financing to close under the terms and conditions set forth in the Term Sheet, because it could not entered into the Intercreditor Agreement with MidMarket. (*Id.* ¶¶ 39-40.)

On October 7, 2013, Plaintiff circulated another "closing agenda detailing the status of the various items required for the proposed financing." (ECF No. 56-1 ¶ 39 and Closing Agenda Email Exchange (ECF No. 41-14) at 2.) On October 13, 2014, Plaintiff emailed Defendant attempting to collect on the Break-Up fee of the Term Sheet, but willing to negotiate on the terms set forth in the Term Sheet. (Pl. Email Regarding Break-Up Fee (ECF No. 41-19).) Specifically, the email stated, "I tried to work-up something that addresses the break-up fee to date in an equitable way and covers our management time and energy getting the deal done in light of what has transpired to date." (*Id.*) However, in emails exchanged later the same day, Plaintiff stated, "we are happy to continue to work on the matter if you like. If you don't want to continue the process, I understand— we have no plans to enforce the break-up fee given the situation." (Pl. Email (ECF No. 41-20).)

Defendant did not pay a Break-Up fee, but instead the parties continued to communicate toward the proposed financing. On October 14, 2013, Plaintiff sent a draft Intercreditor Agreement to MidMarket for review. (ECF No. 56-1 ¶ 41.) Plaintiff's draft Intercreditor Agreement provided for the same requirements as MidMarket and Plaintiff discussed in their earlier discussions: (1) a secondary lien on Defendant's assets; (2) the right to cure any monetary default on behalf of Defendant; and (3) the unilateral right to purchase MidMarket's position at par in the event of Defendant's default. (*Id.* ¶ 42.) MidMarket did not propose any modifications to the proposed Intercreditor Agreement, but only stated that the second priority line called for in the Intercreditor Agreement was a complete "non-starter" as a result of the PNC Agreement. (*Id.* ¶ 50 and Intercreditor Email (ECF No. 41-21) at 3.) Therefore, MidMarket and Plaintiff could not come to terms on the Intercreditor Agreement. (ECF No. 56-1 ¶¶ 47-50.) On November 15, 2013, Plaintiff wrote to Defendant demanding it pay the $500,000 Break-Up fee. (ECF No. 54 ¶ 43.) By letter dated November 25, 2013, Defendant refused to pay the Break-Up fee. (*Id.* ¶ 44.)

Subsequently, in December 2013, Defendant completed the sale of convertible debentures in the principal face of $11.625 million with a maturity date of June 13, 2015. (*Id.* ¶ 45.)

**B. Facts Relating to Writ of Attachment**

Defendant has incurred losses and carried substantial debt for years. (*See* ECF No. 45-1 at 4-5 and ECF No. 49 at 4.) For instance, Defendant's 2012 SEC Form 10-K disclosed losses from operations of $2.8 million and $21.2 million in indebtedness. (2012 Form 10-K (ECF No. 50-2) at 19-20.) Defendants Form 10-K for the year ending on December 31, 2016, demonstrates Defendant "incurred losses from operations of $18.6 million and $25.9 million" in 2015 and 2016, respectively. (2016 Form 10-K (ECF No. 45-4) at 8.) The 2016 Form 10-K also stated Defendant believed its "cash balances . . . will not be sufficient to fund out anticipated level of operations for at least the next 12 months." (*Id.* at 49.)

On February 28, 2017, Defendant alleges its wholly owned subsidiary, ADEX Corporation ("ADEX"), sold its "High Wire Networks" division for $4 million plus a working capital adjustment. (*See* Asset Purchase Agreement (ECF No. 45-6).) Defendant contends ADEX and Defendant are separate entities. (*See* Decl. of Daniel Sullivan (ECF No. 50) ¶¶ 17-21.) ADEX was founded in 1993 and allegedly operated independently prior to Defendant acquiring it in 2012. (*Id.* ¶ 17.) ADEX's management team is separate from that of Defendant. (*Id.* ¶ 18.) ADEX has its own employees and offices separate and apart from those of Defendant. (*Id.*) ADEX has its own contracts with vendors and customers, to which Defendant is not a party. (*Id.* ¶ 19.) ADEX has its own tax identification number, different than Defendant's tax identification number. (*Id.* ¶ 20.) ADEX has its own bank account at PNC Bank. (*Id.* ¶ 21.) Defendant does not have direct access to this bank account, and any transfer of funds between ADEX and Defendant must be effectuated via a formal process. (*Id.*)

Defendant used the proceeds of the ADEX sale to eliminate $3,625,000 of their secured convertible debt. (Form 8-K (ECF No. 45-5) at 3.) The working capital is allegedly due to be paid to ADEX in August 2017, and will constitute $900,000, less adjustments for unrecorded liabilities, costs incurred after the closing date, etc. (ECF No. 45-5 at 3.) The adjustments, including money already collected by ADEX, allegedly leave the working capital now at less than $500,000. (ECF No. 50 ¶ 5 n.1.) Defendant alleges the working capital adjustment is likewise already dedicated toward payroll expenses of ADEX, and for reduction of ADEX and Defendant's remaining senior secured debt. (*Id.* ¶ 25.)

Plaintiff has a different understanding as to the sale. Plaintiff is under the impression Defendant sold ADEX, its subsidiary, to HWN, Inc., not that ADEX sold High Wire Networks. (ECF No. 45-1 at 5.)

The Asset Purchase Agreement actually states:

> **THIS ASSET PURCHASE AGREEMENT** . . . is dated of February 28, 2017, and is made effective as of February 1, 2017, and is made and entered into by and among HWN, INC., a Delaware corporation (the "Purchaser"), ADEX Corp., a New York corporation ("ADEX"), INTERCLOUD SYSTEMS, INC., a Delaware corporation ("InterCloud," and together with ADEX, the "Seller").

(ECF No. 45-6.)

Defendant has also allegedly acquired additional property: (1) an unsecured one-year convertible promissory note in the aggregate principal amount of $2,000,000, plus a working capital of $1,500,000 (the "Mantra Agreement"); and (2) $1,400,000 million in cash plus a working capital adjustment (the "Redapt Agreement"). (ECF No. 51 at 9.) Defendant is alleged to receive the working capital adjustment under the Redapt Agreement on approximately October 12, 2017, and the Mantra Agreement on November 25, 2017. (Pl.'s Letter (ECF No. 61).)

### C. Procedural History

Plaintiff filed its Complaint on December 24, 2013, asserting claims of breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel and seeking (i) the $500,000 Break-Up fee and (2) reimbursement of expenses and attorneys' fees. (*See* Compl. (ECF No. 1).) On February 21, 2014, Defendant moved to dismiss Plaintiff's Complaint for failure to state a claim. (Def.'s Mot. to Dismiss (ECF No. 9).) On August 19, 2014, Judge Wolfson granted Defendant's motion to dismiss in its entirety, finding the Term Sheet evidenced "a clear intent not to be bound" and was thus not a binding agreement under New York Law. (Mot. to Dismiss Opinion (ECF No. 14) at 12.) On August 4, 2015, the Third Circuit reversed the District Court's dismissal, finding

> a plausible reading of the break-up fee clause, which [Plaintiff] allegedly told [Defendant] "was an essential provision of the Term Sheet," was to protect [Plaintiff] from the risk that [Defendant] would secure a more favorable deal after [Plaintiff] had already expended resources on the Financing. Thus, given the language of the Term Sheet, we decline to read the Term Sheet in a manner that "would operate to leave [a] provision of the contract . . . without force and effect."

*White Winston Select Asset Funds, LLC v. Intercloud Sys., Inc.*, 619 F. App'x 157, 162 (3d Cir. 2015) (internal citations omitted). Accordingly, the Third Circuit found it was premature to dismiss the breach of contract claim. (*Id.* at 163.) As a result, Plaintiff's breach of contract and promissory estoppel claims were reinstated and the matter was remanded for further proceedings. (*Id.*) On April 7, 2017, both parties filed Motions for Summary Judgment. (ECF Nos. 38, 39, and 42.) Both motions are opposed. (ECF Nos. 55 and 56.) On September 8, 2017, the Court requested further briefing on the summary judgment motions to be filed by September 12. As such, on September 12, 2017, the parties filed briefs in support of their motions for summary judgment. (ECF Nos. 64-65.)

On April 21, 2017, Plaintiff also filed a Motion for Writ of Attachment seeking to attach one of Defendant's Asset Purchase Agreement's "working capital adjustment." (ECF No. 45-1.) Defendant opposes the Motion for Writ of Attachment. (ECF No. 49.)

## II.    LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if

the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## B. Writ of Attachment

Federal Rule of Civil Procedure 64(a) provides:

> [a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court if located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statue governs to the extent it applies.

Pursuant to Federal Rule of Civil Procedure 64, a federal court must apply the laws of the state in which it sits in determining whether an attachment of property is appropriate. *Granny Goose Foods v. Bhd. of Teamsters, Local No. 70*, 415 U.S. 423, 436, n.10 (1974); *see also Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 536 (D.N.J. 1999) ("State law governs an application for a writ of attachment."); *see also McQueeny v. J.W. Fergusson & Sons, Inc.*, 527 F. Supp. 728, 731 (D.N.J. 1981) ("The federal rules of procedure spell out no details for the writ. They merely provide that State law is to be applied."); *Prozel & Steigman, Inc. v. Int'l Fruit Distrib.*, 171 F. Supp. 196, 199 (D.N.J. 1959) (stating that attachment remedies removed from state court are governed by state law).

New Jersey Court Rule 4:60–5(a) permits a writ of attachment to be issued based on a finding that:

> (1) there is a probability that final judgment will be rendered in favor of the plaintiff; (2) there are statutory grounds for issuance of the writ; and (3) there is a real or personal property of the defendant at a specific location within this State which is subject to the attachment.

*See Preferred Real Estate Invs., LLC v. Lucent Techs., Inc.*, No. 07-05374, 2008 WL 2414968, at *1 (D.N.J. June 11, 2008) (citing *Empresas Lourdes, S.A. v. Kupperman*, No. 06-5014, 2007 WL 2814660, at *3 (D.N.J. Sept. 25, 2007). Attachment is "an extraordinary process." *Corbit v. Corbit*, 13 A. 178 (N.J. 1888). Thus, "jurisdiction to issue it must be shown by the party suing o[n] such

writ," *id.*, and the "rules regarding attachment must be strictly construed," *Wolfson v. Bonello*, 637 A.2d 173, 181 (N.J. Super. Ct. App. Div. 1994).

## III. DECISION

### A. Summary Judgment

#### a. *Breach of Contract*

Defendant argues Plaintiff failed to satisfy multiple conditions precedent to triggering the Break-Up fee provision, such as (1) not executing the Intercreditor Agreement with MidMarket and (2) not being "prepared to close" since it did not complete its due diligence process. (ECF No. 39 at 17-23.) Regarding the latter argument, Defendant contends the language in the Term Sheet stating "the Investor is prepared to close the Financing under substantially the same terms and conditions as set forth herein" required Plaintiff to have completed its due diligence in order to be entitled to the Break-Up fee. (*Id.* at 21-22.) Defendant further argues it did not breach the Term Sheet by failing to close the proposed financing due to arranging financing with PNC Bank. (*Id.* at 23.) However, Defendant does not dispute the Term Sheet was a valid contract. (*See* ECF No. 39.)

Plaintiff argues it is entitled to the Break-Up fee because: (1) it was "prepared to close" under substantially the same terms and conditions set forth in the Term Sheet; (2) Plaintiff either satisfied all conditions precedent to the Break-Up fee provision or those conditions precedent were excused because Defendant prevented Plaintiff from satisfying them; and (3) Defendant breached the Term Sheet by closing with PNC Bank. (*See* ECF No. 42-2 and ECF No. 56). Specifically, as to the "prepared to close" argument, Plaintiff argues it was "prepared to close" the proposed financing agreement because the term "prepared" should be defined as "willing to do something" and not as completing all due diligence and finalizing all closing documents. (ECF No. 56 at 15.)

With respect to the conditions precedent argument, Plaintiff argues that by amending the MidMarket Loan and granting PNC Bank a senior security interest in Defendant's assets, Defendant rendered it impossible for Plaintiff to comply with the Term Sheet by obtaining an Intercreditor Agreement because Section 12(a) of the term sheet stated "[t]he Debenture shall be secured as follows . . . [a] UCC-1 (junior only to the existing credit facility payable to MidMarket Capital) security interest in all tangible and intangible property now owned by the Company . . . ." (ECF No. 42-14 at 6.) Lastly, Plaintiff argues it is entitled to the Break-Up fee because Defendant's financing with PNC Bank was due to the fact that Defendant arranged financing through another source in violation of the Term Sheet. (ECF No. 42-2 at 22-23 and ECF No. 56 at 26-27.)

The "essential elements" of a breach of contract claim "are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *5 Neckles Builders, Inc. v. Turner*, 117 A.D.3d 923, 924 (N.Y. App. Div. 2014); *see Hahn v. OnBoard, LLC*, No. 09-3639, 2011 WL 4737058, at *7 (D.N.J. Oct. 5, 2011) ("To prove breach of a contract under New York law, the party asserting the claim must establish: (1) the existence of a contract; (2) performance of the contract by the party asserting a breach; (3) failure to perform by the party allegedly in breach; and (4) resulting damages from the breach.") (citations omitted).

"[A] contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *IDT Corp. v. Tyco Grp.*, 918 N.E.2d 913, 916 (N.Y. 2009) (alteration in original) (quoting *MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009)). A court "must" construe the contract "to accord a meaning and purpose to each of its parts," *Graphic Scanning Corp. v. Citibank, N.A.*, 116 A.D.2d 22, 25 (N.Y.

App. Div. 1986), and "should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *Laba v. Carey*, 277 N.E.2d 641, 644 (N.Y. 1971) (ellipsis omitted).

"Ascertaining whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 257 (2d Cir. 2002) (citation omitted). A contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (citation omitted). No ambiguity exists, however, "when contract language has a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Id.* (citation omitted).

Where a contract is unambiguous, the Court may interpret its meaning as a matter of law. *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003). New York courts interpret contracts "so as to give effect to the intention of the parties as expressed in the unequivocal language employed." *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978). A court should not interpret a contract in a manner that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003) (citations omitted). A contract should be interpreted to give meaning to all of its terms. *See Mionis v. Bank Julius Baer & Co.*, 301 A.D.2d 104, 109 (N.Y. App. Div. 2002) ("Courts are obliged to interpret a contract so as to give meaning to all of its terms. The reason is clear. Since a contract is a voluntary undertaking, it should be interpreted to give effect to the parties' reasonable expectations.") (citations omitted).

"It is well settled that, where a contract is ambiguous, its interpretation remains the exclusive function of the court unless determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *P&B Capital Grp., LLC v. RAB Performance Recoveries, LLC*, 128 A.D.3d 1534, 1535 (N.Y. App. Div.), *reargument denied*, 132 A.D.3d 1329 (N.Y. App. Div. 2015).

"It is well-settled that no action for breach of contract lies where the party seeking to enforce the contract has failed to perform a specified condition precedent." *Navilia v. Windsor Wolf Rd. Props. Co.*, 249 A.D.2d 658, 659 (N.Y. App. Div. 1998) (citing *Grin v. 345 E. 56th St. Owners*, 212 A.D.2d 504 (N.Y. App. Div. 1995)); *accord Hahn*, 2011 WL 4737058, at *7. Moreover, under New York Law, the "prevention doctrine" bars a defendant who has prevented a condition precedent from occurring from relying on the failure of that condition to justify non-performance of its own contractual obligation. *Thor Props., LLC v. Chetrit Grp. LLC*, 91 A.D. 3d 476, 477 (N.Y. App. Div. 2012); *see also ADC Orange, Inc. v. Coyote Acres, Inc.*, 857 N.E.2d 513, 517 (N.Y. 2006) ("[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." (quoting *Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of N.Y.*, 268 N.E.2d 782, 784 (N.Y. 1971))). "The doctrine is purely one of waiver; active conduct of the conditional promisor, preventing or hindering the fulfillment of the condition, eliminates it and makes the promise absolute." *Cross & Cross Props., Ltd. v. Everett,* 886 F.2d 497, 502 (2d Cir. 1989) (citation omitted); *Amies v. Wesnofske*, 174 N.E. 436, 438 (N.Y. 1931). In essence, under the prevention doctrine, the condition precedent to the defendant's obligation is excused and the defendant's conditional promise becomes absolute. *See Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*, 109 F. Supp. 3d 587, 605 (S.D.N.Y. 2015).

## 1. **Whether Plaintiff Satisfied all Conditions Precedent**

It is well-settled under New York law "that no action for breach of contract lies where the party seeking to enforce the contract has failed to perform a specified condition precedent." *Navilia*, 249 A.D.2d at 659. Therefore, the Court must first determine whether or not Plaintiff satisfied its conditions precedent. Defendant argues Plaintiff failed to satisfy two conditions precedent to triggering the Break-Up fee provision: (1) executing the Intercreditor Agreement with MidMarket and (2) being "prepared to close" since it did not complete its due diligence process. (ECF No. 39 at 17-23.) Plaintiff does not dispute that either of these were conditions precedent to the Break-Up fee. (*See* ECF No. 42-2.) The Court will address both in turn.

### i.     The Intercreditor Agreement

Section 12 of the Term Sheet relates directly to the Intercreditor Agreement condition precedent and provides:

> Collateral for the Debenture. The Debenture shall be secured as follows:
>
> a. A UCC-1 (junior only to the existing credit facility payable to MidMarket Capital) security interest in all tangible and intangible property now owned by the Company or to be acquired in the future . . . .
>
> b. As a condition precedent to the Financing, the Investor shall have entered into a [sic] intercreditor agreement (the "Intercreditor Agreement") with MidMarket Capital on terms and conditions acceptable to the Investor and Mid-Mark in their respective discretion.

(ECF No. 42-14 at 6.) As such, this Section articulates: (1) Plaintiff can only take a security interest junior to MidMarket and (2) Plaintiff and MidMarket must enter into an agreed upon Intercreditor Agreement.

On September 20, 2013, Defendant closed on the revolving credit and security agreement with PNC Bank which allowed PNC Bank to obtain a first priority security interest in Defendant's assets. (ECF No. 54 ¶¶ 36-37.) PNC Bank's revolving credit facility was secured by substantially all of Defendant's assets and the assets of Defendant's subsidiaries. (*Id.* ¶ 38.) As a result, on October 11, 2013, Defendant informed Plaintiff, that, at best, it would "be taking a third position as to all collateral behind MidMarket and PNC [Bank]." (*Id.* ¶¶ 39-40.) Therefore, Defendant rendered it impossible for Plaintiff to be "junior only to the existing credit facility payable to MidMarket" per the Term Sheet. (ECF No. 42-14 at 6.) In turn, Defendant further rendered it impossible for Plaintiff and MidMarket to ever come to an agreement that would be consistent with the Term Sheet and to enter into an Intercreditor Agreement due to the PNC Bank financing.

Defendant's argument that "any application of the prevention doctrine must be 'consistent with the intent of the parties to the agreement," is not persuasive. (ECF No. 55 at 9 (citing *Thor Properties, LLC*, 91 A.D.3d at 477)). It further argues the evidence demonstrates Defendant entering into the credit agreement with PNC Bank was not the "but-for" cause of Plaintiff and MidMarket's failure to come to terms. (*Id.*) Instead, Defendant claims Plaintiff's failure to satisfy Section 12(b) flowed directly from Plaintiff ignoring MidMarket's objections before the Term Sheet was signed and Plaintiff's rigid inflexibility to negotiate with MidMarket on any terms. (*Id.*) Essentially, Defendant argues Plaintiff bore sole responsibility for its inability to successfully negotiate an Intercreditor Agreement with MidMarket. Defendant also argues Plaintiff was aware (1) Defendant was negotiating with other lenders and (2) that Plaintiff was aware from the beginning that it would have to come to an agreement with MidMarket. (*Id.* at 10.)

MidMarket and Plaintiff could not come to an agreement during their June 2013 discussions prior to Defendant signing the Term Sheet. However, once Defendant entered into the

PNC Agreement, it became impossible for Plaintiff and MidMarket to enter into an Intercreditor Agreement consistent with the Term Sheet, which stated Plaintiff would be junior only to MidMarket.[2] If Defendant did not enter into the PNC Agreement, Plaintiff and MidMarket could have continued to discuss the Intercreditor Agreement prior to the termination date of November 15, 2013. The Court cannot speculate as to whether the parties would ever come to an agreement prior to the termination date. However, on October 14, 2013, Plaintiff sent a draft Intercreditor Agreement to MidMarket for review. (ECF No. 56-1 ¶ 41.) Plaintiff's draft Intercreditor Agreement provided for the same requirements as MidMarket and Plaintiff discussed in their earlier discussions: (1) a secondary lien on Defendant's assets; (2) the right to cure any monetary default on behalf of Defendant; and (3) the unilateral right to purchase MidMarket's position at par in the event of Defendant's default. (*Id.* ¶ 42.) MidMarket did not propose any modifications to the proposed Intercreditor Agreement, but only stated that the second priority line called for in the Term Sheet was a complete "non-starter" as a result of their interest and the PNC Agreement. (ECF No. 41-21 at 3.) The fact that MidMarket stated the Intercreditor Agreement was a "non-starter" because Defendant entered into that agreement with PNC Bank indicates the parties may have been able to work out an agreement had Defendant not entered into an agreement with PNC Bank. The Court notes Plaintiff's draft Intercreditor Agreement provided for the same demands as

---

[2] Plaintiff entered into discussions with MidMarket regarding the contemplated Intercreditor Agreement in June 2013, before Defendant executed the Term Sheet. (ECF No. 42- 1 ¶ 14.) During their conversation, Plaintiff informed MidMarket that they sought: (1) a secondary lien on Defendant's assets; (2) the right to cure any monetary default on behalf of Defendant; and (3) the unilateral right to purchase MidMarket's position at par in the event of Defendant's default. (ECF No. 56-1 ¶¶ 24-26.) Defendant alleges that during this discussion MidMarket objected to several terms proposed by Plaintiff, and the discussion terminated without resolution of those disputes. (*Id.*)

those Plaintiff asked for earlier and were never resolved. Nonetheless, the Court finds Defendant prevented Plaintiff from even engaging in further negotiations with MidMarket. Accordingly, under the prevention doctrine, the Intercreditor Agreement condition precedent to the defendant's obligation was excused. *See Royal Park Invs. SA/NV*, 109 F. Supp. 3d at 605.

### ii.  **"Prepared to Close"**

Defendant contends the "prepared to close the Financing under substantially the same terms and conditions as set forth" language in the Term Sheet required Plaintiff to have completed its due diligence in order to be entitled to the Break-Up fee. (ECF No. 39 at 21-22.) Plaintiff argues it was "prepared to close" the proposed financing agreement because the term "prepared" means "willing to do something" and not completing all due diligence and finalizing all closing documents. (ECF No. 56 at 15.)

As articulated above, "[a]scertaining whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." *Lucente*, 310 F.3d at 257 (citation omitted). When a contract is unambiguous, the Court may interpret its meaning as a matter of law. *See Photopaint Techs., LLC*, 335 F.3d at 160. "[W]here a contract is ambiguous, its interpretation remains the exclusive function of the court unless determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *P&B Capital Grp., LLC*, 128 A.D.3d at 1535.

The Break-Up Fee provision states, in relevant part:

> "If, within forty-five (45) days from the Termination Date (as defined below), the Investor is *prepared to close the Financing under substantially the same terms and conditions as set forth herein*, but the Company fails to close with Investor due to the fact that the company has arranged any financing through another source then the Company shall pay the Investor a break-up fee . . . .

(ECF No. 42-14 at 9.) The Court finds this provision unambiguously means Plaintiff was entitled to the Break-Up fee if it was willing to and engaged in some due diligence to close on substantially the same terms and conditions as set forth in the Term Sheet, but not that it must have completed all due diligence.

Defendant's interpretation defies logic. Under its interpretation, if Defendant closed with and secured senior financing with another lender the day after it executed the Term Sheet, rendering it impossible for Plaintiff to obtain the second-priority security interest required by the Term Sheet, Plaintiff would not be entitled to the Break-Up fee because, at the time payment of the fee was triggered, it had not yet finalized all closing documents. Such interpretation would encourage parties to needlessly incur expenses, rather than mitigate their damages. It makes no sense to penalize Plaintiff for avoiding additional due diligence expenses after Defendant closed with PNC Bank. It is undisputed Plaintiff stood willing to proceed with the proposed financing on substantially the same terms articulated in the Term Sheet at the time Defendant closed with PNC Bank and performed some due diligence to close on those terms. (*See* ECF No. 54 ¶ 33 (demonstrating that Defendant "does not dispute that [Plaintiff] participated in the due diligence process during the summer and fall of 2013").) Defendant cannot now evade its contractual obligation by arguing Plaintiff did not complete its due diligence, when the Term Sheet could not ultimately be effectuated as a result of Defendant's own actions.

Defendant's interpretation of "prepared to close" also eliminates the purpose behind the Break-Up fee. Plaintiff told Defendant the Break-Up fee was an essential provision of the Term Sheet, to protect Plaintiff from the risk that Defendant would secure a more favorable deal after Plaintiff had already expended resources on the Financing. (*See* ECF No. 54 ¶¶ 20-21.)

Even under Defendant's interpretation of "prepared to close," the Court finds Defendant rendered it impossible for Plaintiff to close the proposed financing on substantially the same terms and conditions as set forth in the Term Sheet. As articulated above, Defendant rendered it impossible for Plaintiff to be "junior only to the existing credit facility payable to MidMarket" as per the Term Sheet. (ECF No. 42-14 at 6.) Because that condition precedent was rendered impossible, there was no way or reason for Plaintiff to complete its due diligence when the closing could never be performed according to the Term Sheet. Accordingly, the Court finds Plaintiff was "prepared to close" or in the alternative that Defendant's closing with PNC Bank prevented Plaintiff from performing its conditions precedent and thus those conditions were excused.

## 2. Whether the Break-Up Fee Provision was Triggered

Because the Court finds Plaintiff either satisfied or was excused from satisfying all conditions precedent, it must determine whether or not the Break-Up fee provision was triggered. Section 17(d) provides that in order for Plaintiff to be entitled to the $500,000 Break-Up fee provision, Defendant must have failed to close with Plaintiff "due to" the fact that it "arranged [] financing through another source" and closed with another source "within" forty-five days from the Termination Date. (ECF No. 42-14 at 9.)

Defendant argues the Break-Up fee provision was not triggered because Defendant did not fail to close with Plaintiff "due to" arranging financing through PNC Bank and because Defendant's financing with PNC Bank was not "within" forty-five days from the Termination Date as required by the Term Sheet. (ECF No. 39 at 23- 25; ECF No. 55 at 16; and ECF No. 64.) Specifically, Defendant acknowledges the Term Sheet called for Defendant to pay the Break-Up fee if it failed to close with Plaintiff "due to the fact that [Defendant] has arranged any financing through another source." (ECF No. 39 at 23.) "The plain language of the Break-Up [f]ee also

makes clear that there must be a causal nexus between [Defendant] receiving alternative financing, and [Defendant] walking away from the [Plaintiff] deal." (*Id.* at 23-24.) However, Defendant argues its closing with PNC Bank "did not replace or otherwise render superfluous the [Plaintiff's] [f]inancing." (*Id.* at 24.) In addition, Defendant argues its financing with PNC Bank did not occur "within" forty-five days from the Termination Date because "'within forty-five (45) days form the Termination Date' indicates a 45-day period running from November 15, 2013 to December 30, 201[3]" and it closed with PNC Bank on September 20, 2013. (ECF No. 64 at 1-3.)

Plaintiff argues the Break-Up fee provision was triggered because Defendant failed to close with Plaintiff "due to" its financing with PNC Bank prior to the Termination Date. (ECF No. 42-2 at 22-25.) Specifically, Plaintiff argues Defendant's financing from PNC Bank "made it impossible for the parties to close on substantially the same terms and conditions as those set forth in the Term Sheet." (ECF No. 42-2 at 22.) Furthermore, Plaintiff argues the financing with PNC Bank occurred "within" forty-five days from the Termination Date because "within" means "before the end of." (ECF No. 58 at 13 and ECF No. 65 at 3.)

Because the Court previously found Defendant rendered it impossible for Plaintiff and MidMarket to ever come to an agreement that would be consistent with the Term Sheet "due to" its financing with PNC Bank, it accordingly finds Defendant failed to close with Plaintiff "due to the fact that [Defendant] ha[d] arranged [] financing" with PNC Bank. (ECF no. 42-14 at 9.)

The Court also finds Defendant closed with PNC Bank "within" forty-five days from the Termination Date. Section 17(d) of the Term Sheet provides Defendant shall pay Plaintiff the Break-up fee if "within forty-five (45) days form the Termination Date," Plaintiff is prepared to close, but Defendant fails to close with Plaintiff due to the fact that it has arranged financing through another source and closed with another lender "within such 45 days." (ECF No. 42-14 at

9.) The Court agrees with Plaintiff and finds "within" forty-five days unambiguously means before the end of, creating an expiration date for the Break-Up fee provision, not an exclusivity period between November 15 and December 30, 2013. Plaintiff's interpretation of the word is consistent with the Term Sheet, the parties' intentions, and is commercially reasonable.

Plaintiff's interpretation of "within" is consistent with Section 22 of the Term Sheet, while Defendant's interpretation disregards that Section. Section 22 provides the obligation to pay the Break-Up fee "shall survive the Termination Date." (ECF No. 42-14 at 10.) Indeed, it confirms the Break-Up fee had to exist prior to the Termination Date and could not solely exist between November 15, 2013 and December 30, 2013. Because a contract should be interpreted to give meaning to all of its terms, *Mionis*, 301 A.D.2d at 109, and Plaintiff's interpretation gives meaning to all terms while Defendant's interpretation is inconsistent with the Term Sheet as a whole, the Court finds "within" means before the end of. *See Olszewski v. Cannon Point Ass'n*, 148 A.D.3d 1306, 1309 (N.Y. App. Div. 2017) (stating "a reading of the contract should not render any portion [thereof] meaningless, and the contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." (citations omitted)).

Even if the Court found the Term Sheet was ambiguous subject to either Plaintiff or Defendant's interpretation, its interpretation remains the exclusive function of the Court unless determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." *P&B Capital Grp., LLC*, 128 A.D.3d at 1535. It is undisputed the essential provision of the Term Sheet was to protect Plaintiff from the risk that Defendant would secure a more favorable deal after Plaintiff had already expended resources on the financing. (*See* ECF No. 54 ¶¶ 20-21.) Defendant's interpretation would eviscerate that purpose because it would have allowed Defendant to close with another investor

with impunity up to the Termination Date, when it would be expected that Plaintiff had already competed its due diligence.

In addition, the parties' correspondence during the negotiation of the Term Sheet reveals that Plaintiff's interpretation is consistent with the parties understanding of the term "within." In a June 18, 2013 email, Defendant, in an attempt to limit the Break-Up fee time period, proposed a carve-out for Defendant's contemplated stock offering, suggesting that "*if prior to the date* you are prepared to close we are advised by the SEC that they are prepared to declare our offering effective, we should have the right to decline your funds without penalty." (ECF No. 42-20 (emphasis added).) Defendant's email demonstrates it understood the Break-Up fee to exist prior to the Termination Date. Lastly, while not dispositive, Defendant never raised the timing argument as a defense in response to Plaintiff's demand for the Break-Up fee prior to this litigation. (*See* ECF No. 42-29.)

Therefore, the Court finds "within" means "before the end of." Because the parties agree Defendant closed with PNC Bank on September 20, 2013, prior to December 30, 2013, the Break-Up fee provision was triggered. Accordingly, the Court **GRANTS** Plaintiff's Motion and finds the Break-Up fee provision was triggered.

### b. Liquidated Damage vs. Penalty

Defendant argues that "[e]ven if the Court were to find that the Break-Up Fee provision of Section 17(d) was triggered, the $500,000 amount represents an unenforceable penalty under New York law." (ECF No. 39 at 25.) Specifically, it argues that Plaintiff's maximum return, had the financing went through, would have been $600,000. (*Id.* at 28.) Therefore, the Break-Up fee of $500,000 represents 83% of Plaintiff's expected gain, which is "grossly disproportionate" to Plaintiff's actual damages as a result of a breach. (*Id.*) Plaintiff argues the Break-Up fee provision

is enforceable because it is a liquidated damages provision, not a penalty. (ECF No. 56 at 30-35.) Specifically, Plaintiff argues Defendant has failed to offer evidence demonstrating that the $500,000 Break-Up fee is plainly disproportionate to the $600,000 gain Plaintiff would have reaped from the proposed financing. (*Id.* at 34.) It further argues the Break-Up fee was negotiated between two commercially sophisticated parties represented by counsel as part of an arms-length transaction and thus should be found enforceable. (*Id.* at 34-35.)

"Whether a contractual provision represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances. *Bates Advert. USA, Inc. v. 498 Seventh, LLC*, 850 N.E.2d 1137, 1139 (N.Y. 2006). In *Truck Rent–A–Center*, the New York Supreme Court characterized liquidated damages as "[i]n effect, . . . an estimate, made by the parties at the time they enter into their agreement, of the extent of the *injury* that would be sustained as a result of breach of the agreement." 361 N.E.2d 1015, 1018 (N.Y. 1977) (emphasis added). The New York Supreme Court called the distinction between liquidated damages and a penalty "well established":

> A contractual provision fixing damages in the event of breach will be sustained *if the amount liquidated bears a reasonable proportion to the probable loss* and the amount of actual loss is incapable or difficult of precise estimation. *If, however, the amount fixed is plainly or grossly disproportionate to the probable loss*, the provision calls for a penalty and will not be enforced.

*Id.* at 1018 (emphasis added) (citations omitted).

"The party challenging the liquidated damages provision bears the burden of proving that the provision constitutes a penalty." *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 413 (S.D.N.Y. 2004). In order to challenge a liquidated damages provision, the party "must demonstrate either that damages flowing from a prospective early termination were readily ascertainable at the time [the parties] entered into their [contract], or that the [liquidated damages

are] conspicuously disproportionate to these foreseeable losses." *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005). "Parties to a contract have the right . . . to specify within a contract the damages to be paid in the event of a breach, so long as such a clause is neither unconscionable nor contrary to public policy." *L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 363 (S.D.N.Y. 2010) (quoting *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y.1990)). "The reasonableness of the liquidated damages and the certainty of actual damages must be measured as of the time the parties entered the contract, not as of the time of the breach." *Id.* "When evaluating a liquidated damages provision, a court must also give due consideration to 'whether the parties were sophisticated and represented by counsel, the contract was negotiated at arms-length between parties of equal bargaining power, and . . . that [the provision] was freely contracted to.'" *Id.* at 364 (quoting *The Edward Andrews Grp., Inc. v. Addressing Servs. Co., Inc.*, No. 04-6731, 2005 WL 3215190, at *6 n.3 (S.D.N.Y. Nov. 30, 2005)). Further, as the Third Circuit articulated previously in this case, "[a] court applying New York law should find a provision unenforceable as a penalty only in 'rare cases,' *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 389 N.E.2d 113, 116 (1979), and '[t]he burden is on the party seeking to avoid liquidated damages . . . to show that the stated liquidated damages are, in fact, a penalty,' *JMD Holding Corp.*, [828 N.E.2d at 609.]" *White Winston Select Asset Funds, LLC*, 619 F. App'x at 162-63. "Absent some element of fraud, exploitive overreaching or unconscionable conduct on the part of the [parties], there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties." *Fifty States Mgmt. Corp.*, 389 N.E.2d at 116.

Lastly, "[w]here the court has sustained a liquidated damages clause the measure of damages for a breach will be the sum in the clause, no more, no less. If the clause is rejected as being a penalty, the recovery is limited to actual damages proven." *Brecher v. Laikin*, 430 F. Supp.

103, 106 (S.D.N.Y. 1977) (citations omitted); *see also* 3 E.A. Farnsworth, Contracts § 12.18, at 304 (3d ed. 2004) (noting that, where a liquidated damages provision is an unenforceable penalty, "the rest of the agreement stands, and the injured party is remitted to the conventional damage remedy for breach of that agreement, just as if the provision had not been included").

Therefore, Defendant must demonstrate either that damages flowing from not closing on the financing were readily ascertainable at the time the parties entered into the Term Sheet, or that the Break-Up fee provisions is conspicuously disproportionate to these foreseeable losses. *JMD Holding Corp.*, 828 N.E.2d at 609. The Break-Up fee provision was required to compensate Plaintiff for "allocation of time, expectation of partner's time working on a transaction, opportunity costs associated with a transaction . . . [and] complexity of the transaction." (ECF No. 44-6 at 18:16-21:1.) Defendant argues the Prepaid Expense Fee provision compensated Plaintiff for allocation of time, expectation of partner's time, opportunity costs, and complexity of the transaction. (*See* ECF No. 39 at 29 and ECF No. 57 at 10.) The Court disagrees.

When Plaintiff and Defendant entered into the Term Sheet, they could not readily forecast these expenses as evidenced by multiple provisions of the Term Sheet. The Term Sheet provides:

> 18. <u>Expenses.</u> The Financing will be made without cost to Investor. The Company shall be required to pay all of Investor's reasonable costs, fees, and expenses (including, but not limited to all travel and other expenses incurred by Investor pursuant to the due diligence (including data subscription), audit, negotiation, appraisal, documentation or closing, and costs, fees and expenses of any inspectors or consultants engaged by Investor) paid or incurred in conjunction with the consideration of the Financing. In addition, the Company also agrees to pay all legal fees and expenses of Investor's attorneys for services provided to Investor in connection with this transaction or the collection of amounts due to Investor pursuant to the Term Sheet or any other agreement by and between Investor and the Company. The legal fees of Investor's attorney shall be calculated on a time-spent basis, based upon the standard hourly rates of Investor's attorney generally charged to clients of that firm on similar matters. In the event that the transaction outlined

hereunder is not closed, then the Company shall fully reimburse Investor for any and all legal or other expenses incurred by it pursuant to the due diligence, audit, negotiation, appraisal, and documentation of the proposed transaction.

*The Investor agrees to notify the Company at any time such costs and expenses exceed Twenty Five Thousand and No/100ths and to provide the Company with detailed invoices reflecting such costs and expenses incurred under this Paragraph 17.*

19. <u>Prepaid Expense Fee.</u> Upon its acceptance, the Company shall tender to Investor, the sum of Twenty-Five Thousand Dollars ($25,000.00) to represent your prepayment of the Investor's anticipated due diligence and legal expenses (the "Prepaid Expense Fee"). The Prepaid Expense Fee (which shall be deposited in a segregated clients due diligence account maintained by the Company). . . . *In the event, that the Prepaid Expense Fee is to exhausted [sic] prior to the Closing, the Company agrees to tender additional amounts to the Investor, or its counsel, to replenish the Prepaid Expense Fee upon three (3) days written notice to the Company with a detailed accounting of the expenses paid to such date.*

(ECF No. 42-14 at 9-10 (emphasis added).) As a preliminary matter, neither Section 18 nor 19 of the Term Sheet takes into consideration opportunity costs associated with a transaction or complexity of the transaction. Furthermore, contrary to Defendant's argument, allocation of time and expectation of a partner's time working on a transaction were not entirely compensated for in the Prepaid Expense Fee. Instead, the Prepaid Expense Fee provision in conjunction with the Expenses provision demonstrates those damages were not precisely ascertainable and that the $25,000 was a just an initial startup payment for Plaintiff to begin its due diligence. Indeed, Plaintiff "seeks reimbursement of $23,500 in expenses incurred over and above the prepaid expense fee." (ECF No. 56 at 9 n.5 and ECF No. 42-3 ¶ 6.) Because Plaintiff has failed to establish Plaintiff's prospective damages were capable of precise estimation at the time the parties executed the Agreement or that the Break-Up fee was grossly disproportionate to Plaintiff's probable loss and the New York Court of Appeals has "cautioned generally against interfering with parties'

agreements," the Court finds the Break-Up fee enforceable. *JMD Holding Corp.*, 828 N.E.2d at 609-10 (citing *Fifty States Mgmt. Corp.*, 389 N.E.2d at 116 ("Absent some element of fraud, exploitive overreaching or unconscionable conduct . . . to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties."); 3 Farnsworth, Contracts § 12.18, at 303-04 ("[I]t has become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties. Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation.")). Accordingly, Plaintiff's Motion for Summary Judgment is **GRANTED** in its entirety and Defendant's Motion for Summary Judgment is **DENIED** in its entirety.[3]

### B. Writ of Attachment

Plaintiff seeks a writ of attachment because it doubts Defendant will be able to satisfy a judgment for the full Break-Up fee, if judgment is entered in favor of Plaintiff at a later time. (ECF No. 45-1 at 1.) Specifically, Plaintiff argues it is entitled to a writ of attachment because it has established a probability that judgment will be rendered in its favor, a statutory basis for issuance of the writ, and the existence of property in New Jersey subject to attachment. (*See id.*) Defendant argues Plaintiff has failed to satisfy all the elements for a writ of attachment, specifically a probability of success and the existence of property in New Jersey subject to attachment. (*See* ECF No. 49.) However, at oral argument the parties agreed the granting of summary judgment in favor of either Plaintiff or Defendant would render the writ of attachment moot. (ECF No. 63.) Because

---

[3] In the alternative, Plaintiff sought summary judgment on its promissory estoppel claim. (ECF No. 42-2 at 24-25.) However, because the Court finds Plaintiff is entitled to the Break-Up fee, it need not address Plaintiff's alternative argument of promissory estoppel.

the Court grants summary judgment in favor of Plaintiff, the Writ of Attachment is **DENIED AS MOOT**.

IV.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (ECF No. 42) is **GRANTED** and Defendant's Motion for Summary Judgment (ECF Nos. 38-39) is **DENIED**. Plaintiff's Motion for Writ of Attachment is **DENIED AS MOOT**.

**Date:** October 3, 2017                    */s/ Brian R. Martinotti*
                                             **HON. BRIAN R. MARTINOTTI**
                                             **UNITED STATES DISTRICT JUDGE**